MILTON H. MILLER, Plaintiff, v. J. T. SULLIVAN & Co.,
Defendants.

Miller gave money to Robbins to invest in leaf tobacco, with a verbal
agreement that they should share the profits equally, saying nothing
about losses. Robbins used the money to pay his own debts and bought
tobacco in the name of Miller, giving his own acceptances for the pur-
chase money, and pledging the tobacco for the payment of the accept-
ances to the defendants, who gave a bill of sale receipted in the name of
Miller, which Robbins gave to Miller. Miller was unknown to defend-
ants, and they were informed by Robbins that the purchase was for
himself, though made in Miller's name.

Held, that Miller and Robbins are to be regarded as partners in the pur-
chase of the tobacco, and that Miller was bound by the agreement of
Robbins pledging the tobacco to secure the payment of his acceptances
for the purchase money; that the defendants were not responsible to
Miller for the misapplication by Robbins of the money he had received
from Miller; that the receipted bill given by the defendants in the name
of Miller, on receiving the acceptances of Robbins, was open to explana-
tion, and did not estop the defendants from holding the tobacco to se-
cure the payment of the acceptances according to their agreement with
Robbins.

IN GENERAL TERM ON ERROR.

Standish & Brown and Yaple, for plaintiffs.

Kebler & Whitman and Throop, for defendants.

TAFT, J.   This case comes into this court on a petition
error.

The petition of Miller, plaintiff in the suit below, stated
that during the month of September, 1868, he purchased
seventeen hogsheads of tobacco and stored them in the ware-
house of defendants in the city of Covington; that he paid
for the tobacco in cash, and took from the defendants the
receipted bills and warehouse receipt of the defendants for
the tobacco; that afterward the defendants sold the plain-

tiff's tobacco without his knowledge and pocketed the proceeds, and refuse to pay over any part of them. The amount of his claim was $3,590.94.

The defendants, by answer, denied all the allegations of the plaintiff; denied that they made any purchases for him or sold any of his tobacco, or that they are in any manner indebted to him.

From the bill of exceptions, it appears that John I. Robbins was a purchaser of tobacco from the defendants from time to time. He was a manufacturer of tobacco and a dealer in the article.

It appears that he was accustomed to purchase of the defendants, giving acceptances for the purchase money at sixty or ninety or some other number of days, leaving the tobacco in the warehouse of the defendants, as the defendants claim, to remain as security for the payment of the drafts.

The clerk of the defendants gave a receipted bill for this tobacco, on receiving the acceptances, and blank tickets or orders for the delivery of the tobacco.

We are satisfied, however, that these tickets were not, by the usage of the trade, intended to convey a right to the property without paying for it. They were mere blank orders and could bind nobody.

The defendants say that Robbins bought tobacco in a variety of names, but advised them that the purchases were all made for himself. He himself says that such was the case generally; indeed, in all cases except in the case of these seventeen hogsheads bought in the name of Miller. The defendants evidently supposed that the purchases were made for himself by Robbins. They had nothing to do with any one else; and we are satisfied that Robbins informed the defendants that the purchases were for himself, though entered at his instance in the name of Miller.

Sullivan and Dunham both testify that they had a contract with Robbins that the tobacco bought by him should

be held by them as security for the payment of the acceptances, and that they knew nothing of Miller. It is not claimed that Miller called on the defendants, or notified them personally of his interest, or had any intercourse with them. The acceptances became due and were renewed perhaps several times, and finally the defendants sold the tobacco and applied the proceeds to the payment of the acceptances, which was in accordance with the understanding they had with Robbins, the only party they had seen or known in the transaction.

This we think is a fair statement of the facts on which the defendants claim that they are entitled to the fund. The proceeds of the sales did not quite pay off the indebtedness to the defendants for purchases made by Robbins from them.

The facts on which the plaintiff claims the proceeds of this tobacco are, that at about the time when these purchases were made, Robbins, meeting the plaintiff, informed him that money could be made by purchasing tobacco, and the plaintiff having seven or eight thousand dollars to invest, it was agreed between them that plaintiff should advance the money to pay for tobacco, and that Robbins should make the purchases and also the sales, and that they should share the profits; that the tobacco should not be sold but by order of Miller, and should be subject to his control. No express arrangement was made as to losses, as they did not anticipate any. In fact, Miller never did assume any control of the tobacco, or say anything to defendants about it, till some time after it was sold. The moneys which Miller advanced to Robbins were not paid to defendants for the tobacco, although Miller supposed that such was the case. Robbins must have applied these moneys to the payment of his individual debts, while he bought these tobaccos on credit. Probably he paid the money, or most of it, to the defendants on former purchases, and thus was enabled to get a credit for the tobacco in

question, the plaintiff, Miller, supposing that the tobacco was bought in his name, and paid for in cash, and holding the receipted bill, with the blank tickets, for the tobacco which had been given him by Robbins at or about the time of receiving the money from the plaintiff.

It is evident that both these parties have been deceived by Robbins, and the question for us to determine is, which of them must suffer the loss? They have both trusted him. The plaintiff trusted him with his money and property. The defendants trusted him with the receipted bill and the unsigned tickets, though the property had not in fact been paid for, except by the acceptance of Robbins, to secure the payment of which they had an agreement with Robbins that they were to hold the tobacco.

We think the preponderance of evidence is in favor of the existence of the contract between Robbins and the defendants, that this, with other tobacco purchased by Robbins, should be held for the payment of the acceptances. We can not regard his qualified denial as entitled to great weight. He seems to have been false to both parties in a way to show that truthfulness was not one of his virtues.

As to his relation to the plaintiff, Robbins says that:

"The arrangement I had with Mr. Miller was this: Miller had money to invest. I told him cutting tobacco was a good investment. I was to share in the profits for my labor and services."

As to losses, he says they did not suppose there would be any, and did not talk about such a contingency.

Robbins managed the whole matter. He signed Miller's name, and used it very much as he pleased.

He says that after purchasing tobacco and getting the tickets and passing them to Miller, he in several instances bought the tobacco back, and took the tickets which had been made out for Miller to sign, and instead of having Miller sign his own name to the tickets when he called

for the tobacco, he (Robbins) signed the name of Miller to the tickets, and received the tobacco from the defendants —a circumstance tending to confirm the statement made by him to them, that the purchases were all his own, and that the names of Miller and others, used by him, were merely nominal.

He says, also, that "the Miller money did not go to pay for the Miller tobacco, but to take up acceptances given forty-five days before September 6, 1868."

Miller himself says: "I had some money in the fall of 1868, which I was using in various ways. I was acquainted with Robbins, and he told me to invest in cutting leaf tabacco. I asked him to buy some tobacco, and we would sell again and divide the profits."

On cross-examination he says: "The profits were to be shared equally. Mr. Robbins was to manufacture the tobacco in his factory, if it would sell at a loss, so that I was not to lose anything. Mr. Robbins was to sell by my advice; that was my understanding. There was to be no tobacco sold without my consent."

He says that he got a mortgage on Robbins' factory and some other property as security, which did not, however, turn out to add much to his security. He says: "I looked to John I. Robbins to carry out his agreement, and pay me all the money he had from me. I asked him for money, and he said he had none—said it was not a good time to sell. I supposed Robbins was an honest man. I never went near the defendants' warehouse. These collaterals (the mortgage and certain insurance company stock) are held by me for the tobacco sued on, as well as the $4,000, in case I lose this suit. I looked to both Robbins· and these defendants. We were to divide profits. We said nothing about losses; we did not expect to make any. *If we had, I suppose we should have shared them.*

"*If tobacco declined in the market, he (Robbins) could take*

*the tobacco and work it up, so that there should be no loss to me."*

On re-examination, he says:

"I treated the tobacco as so much money. I looked to these securities for all the indebtedness of Robbins to me, including the tobacco sued on. I considered these tobaccos as so much cash in hand."

From the testimony of the defendants' clerk, Queen, it appears that Robbins bought in various names, sometimes in the name of the clerk himself, but that the purchases were all made by Robbins, and, as he represented, for himself, and were so regarded and treated by the defendants.

The first question to be determined on the evidence is, what was the relation between Robbins and Miller?

It has been held, in the case of *Boker* v. *Hatch*, in this court, that it does not necessarily result that a man is a partner because he receives a portion of the net profits as compensation for his services. Nevertheless, in the present case, where the plaintiff was to furnish the money and Robbins to do the business and share equally the profits, and under circumstances which imply that if there had been losses they were to share in the losses also, it seems to a majority of the court that Robbins must be regarded either as a partner, or else an agent with power to pledge this property to pay the acceptances given to pay the purchase money of the tobacco, and that the defendants were justified in law in selling the tobacco to pay the debt to them, under the circumstances disclosed in the evidence.

If Robbins was a partner, and purchased the tobacco for the firm, as we think he was, and took a receipted bill, without actually paying for it, the receipt could be explained and the payment enforced as against the partnership. All the evidence on this question comes from the plaintiff himself and from Robbins. It is not to be presumed that the plaintiff gave any more than the full

strength of the circumstances against him on this point. The defendants never had the slightest notice or knowledge of the plaintiff having any interest in the property, except the use of his name by Robbins. They had the property, as they supposed, under an authority to hold it for their security.

The strong point against them is, that their clerk allowed this man Robbins to have a receipted bill, which he presented to Miller. But a receipted bill is not a negotiable paper, and it may be explained. If the purchase was made for plaintiff as a partner with Robbins, neither of them can escape the obligation to pay for it.

Taking into consideration all the circumstances of this case, a majority of the court are of the opinion that Miller was identified with Robbins as a partner in the whole transaction, bound to share the losses as well as the profits, and bound by the contracts of Robbins in carrying on the partnership business, and that, although the money which Miller had intrusted to Robbins to invest had been misapplied by him, the defendants are not responsible for his breach of trust; and being themselves guilty of no fraud, they are entitled to the benefit of their contract with Robbins, and to hold the tobacco as security for the purchase money.

The judgment will be reversed.

HAGANS, J., dissented. It is said Robbins and Miller were either partners—not as to third persons, for no question of that kind arises in the case—but partners *inter sese*, or else Robbins was the agent of Miller, and that, in either view of the case, the defendants are not liable. This case stands upon error, and the findings below by the judge, at Special Term, are entitled to all the consideration of the verdict of a jury, and should not be interfered with unless palpably wrong. Uncertainty is not enough when we come to review the evidence, and any mere doubt ought to be resolved in favor of the judgment. Whether or not

there is a partnership *inter sese* in a given case depends upon the intention of the parties, to be gathered from all the evidence and circumstances surrounding the case. Let us look into the testimony. Robbins was largely engaged in the manufacture of tobacco; Miller had some money and great faith in Robbins, but no experience. He was therefore easily persuaded to venture into speculative leaf tobacco purchases for cash, and the parties enter into an arrangement by which Robbins was to buy the tobacco for Miller, and Robbins was to have one-half the profits for his labor. There was no stipulation as to the losses; they did not expect any losses in manufacturing the tobacco. No agreement or understanding, however, was had between Robbins and Miller as to the losses, should they occur, even by inference; on the contrary, Miller positively states thrice that he was to lose nothing, though he states that if there had been any losses they would have shared them he supposed. This would have been a matter of gratuity, not of obligation. His language is, " Robbins was to manufacture the tobacco in his factory if it would sell at a loss, so that I was not to lose anything; and if tobacco declined he (Robbins) could take it and work it up, so that there should be no loss to me." Any other testimony on this point discloses no different agreement between the parties. Both Miller and Robbins agree that Miller was to control the tobacco, and it was to be sold only on his order or with his consent. Accordingly, on the strength of this arrangement Miller gave Robbins some money—how much does not clearly appear. Miller's whole investment was over $6,000, and the fair inference is that but a small portion was given to Robbins before any purchases were made. However, this makes no substantial difference. In pursuance of the agreement between the parties, Robbins attended the sales at the defendants' warehouse and bought the tobacco in controversy for Miller, as he says. Miller says, " I asked Robbins to buy for me." Robbins had the tobacco put on defendants' books in Miller's name as the

purchaser.   As he was buying largely, with the improper intent of concealing from the government the extent of his transactions, he had the tobacco put not only in his own name, but in the name of defendants' clerk, who entered the sales, and others.   Delivery checks were issued in the names of the purchasers and delivered to Robbins, upon which, when returned to the warehouse signed by the person in whose name they were issued, the tobacco would be delivered if the tobacco was paid for.   Although this business was uniformly a cash business, these defendants were dealing with Robbins on credit, under an agreement that the tobacco he bought was to be held in pledge until paid for.   Defendants were in utter ignorance of Robbins' arrangement with Miller, as Miller was of Robbins' arrangement with defendants.

The defendants supposed all these purchases were by Robbins for himself, and so they aided him in carrying out his improper intent by making these sales entries as they did.   They took Robbins' acceptances at sixty days for all the tobacco, of which fact he did not advise Miller; and they also issued delivery tickets in Miller's name and gave them to Robbins, together with invoices, in Miller's name, of the tobacco in controversy, signed, " Received payment, J. T. Sullivan & Co."   It does not appear that any such receipted invoices were given by the defendants for any other lots of tobacco bought by Robbins at that time. When he got the tickets and the receipted invoices he took them to Miller, showed them to him, and Miller then paid him for them in cash, and he delivered to Miller both tickets and invoices, explaining to him that the tobacco could as well remain with defendants, on storage, as he had no room for it in the factory.   Robbins says, in one place, he *sold* these tickets and invoices to Miller, and he paid him for them; but in another place he describes the transaction as stated.

It appears that Robbins bought other small lots of tobacco for Miller in the same way, Miller having both

tickets and receipts of payment, and that Miller resold to Robbins, delivering to him the tickets, and he obtained the tobacco on them, signing Miller's name thereto, with his assent. On these occasions Miller says he charged the tobacco up to Robbins, when he gave him these tickets, under the belief that all was right. Miller, who lived in Cincinnati, never went near the defendants' warehouse in Covington for six months. He might well rest easy under the circumstances. But when he did go for his tobacco, he found the defendants had sold it to pay for Robbins' debt, who had in the meantime become insolvent, and the defendants refused to recognize his rights at all. Now, it is said that Robbins does not appear well in those transactions, and therefore his statements are not entitled to much weight. But admitting this, Miller's credibility is confessedly above suspicion; and wherever he confirms Robbins, which is mostly the case throughout the testimony, and especially so in every important particular, I think Robbins ought to be entitled to belief in such statements as are corroborated at least.

There is plainly, to my mind, no partnership between Robbins and Miller at all. The preponderance of the evidence is clearly this way. The defendants must be held to have been advised that this purchase for Miller was a *bona fide* one, for they gave a receipted bill, made out in Miller's name, for it, and chose deliberately to look to Robbins for their pay. They are estopped from now claiming that Miller must bear this loss. A reference to the text-books on this subject shows that several vital elements of a partnership are wanting. There was no community in the disposition of the tobacco; Miller alone was to dispose of it. Robbins had no interest in the property, but only in the profits, and he had no right to demand or receive any more.

This share of the profits was merely his measure of compensation. If, on the whole transaction, there had been a loss, Miller would have been obliged, as the testimony

stands, to bear it. He could not call on Robbins to bear any proportion of it, for, as between them, Robbins was only interested in the profit. There does not seem anywhere any intention on the part of either of them that they should be partners *inter sese.* This must appear from their acts and the circumstances before they can be held as such. See Parsons on Partnership (ed. of 1867), 47-50, and the cases cited there. In applying these principles to the facts of this case, there is no room for doubt in my mind on this question.

If any relation, then, existed at all between Robbins and Miller, it was that of principal and agent. I shall not stop to discuss any question as to the extent of Robbins' authority to bind his undisclosed principal, Miller, in the dealings with the defendants.

Judge Story, in his work on Agency, section 433, says: "If a creditor of the principal settles with the agent, and takes a note or other security from the latter for the amount due by the principal, although as between the parties it is intended only as conditional payment, yet if the creditor gave a receipt as if the money were actually received, or the security were an absolute payment, so that the agent is thereby enabled to settle, and does settle with the principal, as if the debt had been actually discharged, and the principal would otherwise be prejudiced, the debt will be deemed, as to the latter, absolutely discharged."

And this upon the plainest principles of equity. "Admissions *in pais,* though made in good faith, may yet be made under such circumstances as to operate by way of estoppel, and preclude the party from afterward gainsaying them." *Beardsly* v. *Foote,* 14 Ohio St. 414.

This case is clearly within these principles, and they are decisive of it. Miller was not an undisclosed principal. The tobacco was knocked down to him, so entered on defendants' books, and both the tickets and invoices were made out in his name, and the defendants are therefore

bound at their peril to know that Miller was a principal and Robbins his agent, and they can not hide themselves behind an excuse that they supposed Robbins was dealing for himself, which they themselves helped to originate. *Brown* v. *Telegraph Co.*, 30 Ind. 39.

It is said that if Robbins and Miller were partners, the receipted invoices would be open to explanation, and they could not escape the obligation to pay for the tobacco. This conclusion may be granted if the premise is admitted, but not otherwise. It is true that if they were partners the receipt might be explained. If they were not partners, as between Robbins and the defendants, it might be explained. The defendants have acted on that idea, for they have sold this tobacco to pay for it, notwithstanding the receipted invoices. But when these receipts and tickets are passed to Miller, who, upon the faith of them, and trusting to them, has undoubtedly suffered harm, I do not think the receipts are open to explanation afterward on the part of the defendants.

Again, it is said that the transfer to Miller of the receipted invoices and the tickets did not transfer the property in the tobacco to him. This may be admitted. But how does this affect the case as presented? Here were two innocent parties, though as to the defendants this can hardly be said. The defendants put it in Robbins' power to deceive and wrong Miller, and of the two innocent parties they must suffer, not Miller. As this case presents itself to me, it is a very strong case for the application of this principle.

I think the judgment, therefore, ought to be affirmed.